Scott *v.* Blood.

---

## HENRY SCOTT & al. vs. HORATIO P. BLOOD.

*General reputation* is not admissible in evidence, in aid of other testimony, to prove a partnership.

This was a writ of review. The original action was assumpsit by *Blood* against *Henry Scott, Jacob G. Remick* and *Daniel Remick,* as partners doing business in the name of *Scott & Remick.* A motion was made to dismiss the writ of review, and over-ruled by the Judge, at the trial, but was not noticed in the argument or decided by the Court. The original plaintiff introduced testimony for the purpose of showing, that the three *defendants* were partners, and with other evidence proved, without objection being made, the declarations of *Scott,* that the three were partners. The original plaintiff then "offered to prove the partnership, as alleged, by testimony of *general reputation.*" Objection was made, and SHEPLEY J. before whom the trial was, refused to admit it. *Blood* filed exceptions.

Scott *v.* Blood.

This case was argued at the *June Term*, 1837, but the opinion was not received by the Reporter until *May* 1, 1840.

*F. H. Allen*, for the original plaintiff, argued, that testimony of general reputation was admissible to prove a partnership on principle, from public policy, and on authority; and cited *Whitney* v. *Sterling*, 14 *Johns. R.* 215; and *Gowen* v. *Jackson*, 20 *Johns. R.* 176.

*Kent*, for the original defendants, controverted those positions, and contended, that the evidence offered was inadmissible. He cited 3 *Stark. R.* 53; 1 *M. & Selw.* 686; 1 *Stark. on Ev.* 61; 14 *East*, 323; 13 *East*, 321; 3 *T. R.* 723; *Whitney* v. *Ferris*, 10 *Johns. R.* 66.

The opinion of the Court was drawn up by

EMERY J.—By the exceptions, two questions might have been raised. First, whether the decision of the Judge was correct in overruling the defendant's motion to dismiss the writ of review. And second, whether the Judge was justified in refusing to admit the defendant in review, to prove the partnership as alleged by the testimony of general reputation. On the argument, no notice was taken of the first. And the subject was discussed as a simple question of the admissibility of general reputation to prove partnership. It was treated as a new question, not directly decided in courts of *Massachusetts* or *Maine*, and as one calculated to control the proof as to partnership, and it was insisted, that less evidence is necessary to settle proof of partnership between defendants, than between plaintiffs. For the articles of partnership between defendants, if they existed, would not usually be known to the plaintiffs, and all the defendant in review, the original plaintiff, could rely on, would be the acts and declarations of the parties, and the impression made on the public by their conduct. That if a party have produced the general impression on the community of the existence of a partnership, we are asked if it ought not to be admitted in evidence, not unsupported, to establish the fact, but that policy and safety of community require this, as ranking among the slight facts, which should go to a jury to prove a partnership.

Two cases decided in *New-York*, are cited to sustain the argument. The first is *Whitney* v. *Sterling*, 14 *Johns. R.* 215, the other *Gowen* v. *Jackson*, 20 *Johns. R.* 176. The main ground, separate from the influence of the two cases cited, upon which the counsel would sustain the exception, *is that of policy*. And it is true, that many contracts are considered void as against the policy of law. Such are those that bind to a total restraint of trade, or of marriage, or promising a reward to a person if by reason of his influence over one of the parties to the match sought to be accomplished, he can procure a marriage between the parties, contracts for the maintenance of suits which no way belong to one, wagers which have a tendency to create a breach of the peace, or affect the feelings of third persons, or an agreement conditioned to secure a person's interest for a candidate at an election, and some others, and among them, those void by the statute of frauds, whose policy has received the commendation of this Court in the case *Gillpatrick* v. *Sayward*, 5 *Greenl.* 465. And something like this policy has been introduced in the regulation of evidence.

Thus it was held, that if a *non compos* aliened by fine or recovery, that should not only bind him; but his heirs. And in *Butler's* note to *Coke on Litt.* 247, (a,) it is said, *Lord Hobart* observes, in the case of *Needler* v. *Bishop* of *Winchester*, that in those cases the law finds these persons not so disabled, nor admits the averment of such disablement, because it is certified by invincible and indisputable credit of the Judge, that they were perfect and able persons. *And so here is a law of policy* that doth not cancel the law of nature, but doth only bound it in point of form and circumstance, it being better to admit a mischief in particular, even against the law of nature, than an inconvenience in general; and it is not the law of nature to admit any improbable surmise against authentic record or evidence. *Hob.* 224. Neither this case nor the opinion of *Ld. Hobart*, is included in the edition published by the learned Judge *Williams*.

The simple note is " of advowson," &c. We do not mean to indicate any regret for this omission, having no particular prepossession in favor of the right of presentation to a church, independent of the approbation of a parish. Fine and recovery are not used with us as a mode of conveyance of estates. In the State of *Con-*

*necticut,* it has been held, that a man may show that he was *non compos mentis* in avoidance of his deed. 3 *Day's R.* 90, *Webster* v. *Woodford.* The Court saying, that the ancient common law was, that a man might do it, that it remained the law during a long period, never altered by legislative act, but the contrary doctrine depends upon decisions of courts, in direct opposition to the common law. That the court's business is to expound, not to make the law.

It is not an agreeable concession, that the rules of evidence should be based on mere shifting grounds of policy. Whose shall it be, the policy of the court, or of the executive, or of the legislature? Questions of sound policy would at first seem to rest with the latter. That the intention of the legislature, in making a constitutional law, should be carried into execution, is a fundamental rule of construction of statutes. But policy is a word susceptible of a good sense and a bad one. If it be understood as art, stratagem, it should never be a ground of judicial decision. If taken in the sense of the art of governing, or the management of affairs, it is rather inappropriate for courts of law to be dealing with it, otherwise than in the synoneme of prudence or wisdom in practical affairs, appertaining to the administration of justice; to suppress a mischief, rightly to expound the law, to guard against fraud, and advance the remedy for a mischief or inconvenience. Thus it is the legal policy of the *United States* for the judicial power, as matter of right and duty, to pronounce as void any act of the legislature, made in violation of the provisions of the constitution. And in this State, the Court has acted in conformity with this policy. *Comins* v. *Bradbury,* 1 *Fairf.* 447; *Trustees of New Gloucester School Fund* v. *Bradbury,* 2 *Fairf.* 118.

While we were a part of the Commonwealth of *Massachusetts,* evidence in the courts of justice was rejected on the grounds of public policy. *Churchill* v. *Suter,* 4 *Mass. R.* 156; *Manning Ex.* v. *Wheatland,* 10 *Mass. R.* 502. But as applied to the case under consideration, this conception of public policy, if acted upon, by admitting *reputation* in evidence, would lead to the unfortunate result of legalizing mere opinion unsanctioned by oath, and perhaps something destitute even of opinion for its foundation. With whom did it originate, and upon what ground was it called into existence? " However imposing from the real or supposed respectability of the

person first expressing it, thorough and patient inquiry, and examination might shew that it rested upon a precarious foundation, or upon none at all."

Every word, writing or act of the defendant, even his silence, if any thing implicating him as connected in the partnership was uttered in his presence and hearing, might justly be adduced in proof. But to introduce reputation in aid, it appears to us, that so far as sound policy should go, it would be decisively in favor of excluding it, because its admission trenches so strongly on well settled rules of evidence, and would be so likely to lead to improper conclusions.

There are general rules respecting the admissibility of evidence. The constant changes in the business relations of society may extend their number, and produce relaxations or qualifications of those which have now the stamp of authority. Admitting one of them to be, that all circumstances capable of affording a reasonable degree of presumption are evidence; it must be received in connexion with another, that hearsay is not evidence, because the party was not on oath, and because the party who is affected thereby, had not an opportunity of cross examining. A sort of distinction is allowed between hearsay and reputation. Yet reputation is nothing more than hearsay derived from those who had the means of knowing the fact, and may exist when those best acquainted with the fact are dead. Still it is a general rule, that reputation is evidence as to general character, as to the fact of legitimacy, relationship, pedigree, rights of common, rights of way, and all rights depending upon custom or prescription. But the admissibility of evidence of this last description, has been a vexed question for many years in *Westminster Hall.* See 14 *East's Rep.* 323, *Doe Lessee of Dedsbury* v. *Thomas & als.* in note.

In *Reed* v. *Jackson*, 1 *East*, 355, it was observed by *Lawrence* Justice, that reputation would be evidence as to right of way, and *Kenyon C. J.* agreed, that reputation was evidence with respect to public rights, claimed as in that case, but not with respect to private rights.

In the case of *Weeks* v. *Sparks*, 1 *Maule & Sel.* 686, part of *Lord Ellenborough's* view of the question was, supposing it to be a case of merely private right, whether according to the habit and

Scott v. Blood.

practice of the circuit in which it was tried, reputation can be received. And he confessed himself at a loss fully to understand upon what principle even in matters of public right, reputation was ever admissible evidence. But he admitted its existence. It was as it were a question between the plaintiff and a multitude of persons. Reputation he says, is in general weak evidence, and when admitted, it is the duty of the Judge to impress on the minds of the jury, how little conclusive it ought to be, lest it should have more weight with them, than it ought to have. The habit of admitting it could not make the law, but it showed what the prevailing opinion has been on this subject amongst a large class of persons interested in the due administration of the law. The opinion thus expressed, must be taken as applicable, particularly to the subject which called it forth, a claim of prescriptive right of tillage on a common, that evidence of reputation was admissible, a foundation having been laid first by evidence of enjoyment of the right. The concession seemed to be almost extorted from the Chief Justice. And the reason is, that he considered the admission of hearsay evidence upon all occasions, whether in matters of public or private right, as somewhat of an anomaly, and formed an exception to the general rules of evidence. And *Le Blanc J.* said, evidence is to be admitted from old persons, not any old persons, but persons conversant with the neighborhood where the waste lies, over which the particular right of common is claimed, of what they heard other persons of the same neighborhood, who are deceased, say respecting the right.

The case of the *King* v. *The Inhabitants of Eriswell*, 3 *T. R.* 707, in which *Buller & Ashurst*, Justices, were opposed in opinion to *Gross J.* and *Lord Kenyon*, Chief Justice, on a question of removal of a pauper, and his declarations before he became insane, and his examination relative to his settlement before two Justices, contains sufficient of judicial wisdom to admonish us to be cautious on the subject of increasing the exceptions to the general rules of evidence. *Ashurst J.* remarked, that if it were a new case, he should be strongly of opinion, that the evidence given, ought not to have been received, as being hearsay evidence. *Lord Kenyon* says, all questions upon the rules of evidence, are of vast importance to all orders and degrees of men ; our lives, our lib-

erty and our property are all concerned in the support of those rules, which have been matured by the wisdom of ages, and are now revered from their antiquity, and the good sense in which they are founded, not rules depending on technical refinements, and the preservation of them is the first duty of judges. And for that cause, he asserted, that the evidence should be given under the sanction of an oath, legally administered and in a judicial proceeding, depending between the parties affected by it, or those who stand in privity of estate or interest with them. He was much afraid that they might endanger a rule of infinite importance to every individual, and by suffering exceptions to creep in, one after another, leave nothing like a rule. *Gross J.* says, no one ever conceived that an agreement could be proved by a witness swearing, that he heard another say, that such an agreement was made.

It has been contended, that where declarations have been made by those who were under no temptations to misrepresent the fact, they are no longer to be considered in the same light with the mere wanton unauthorized declarations of a stranger. Such declarations were once admitted in the case 1 *Mod.* 282, *Luttrell* v. *Raynell & al.* that *William Maynard*, one of the plaintiff's witnesses, was guilty by his own evidence, with the defendants, but was left out of the declaration that he might be a witness. Several witnesses were received and allowed to prove that *William Maynard* did at several times discourse and declare the same things and to the like purpose that he testified now. And the Lord Chief Baron said, though hearsay was not to be allowed as a direct evidence, yet it might be made use of to this purpose, viz. to prove that *William Maynard* was constant to himself, whereby his testimony was corroborated.

We think a more correct view of this subject was taken by this Court, in the case of *Ware* v. *Ware*, 8 *Greenl.* 42, in which this case was cited, and the Court considered the principle clearly established, that an impeached or contradicted witness *cannot be supported* by the party who called him, by proof of his declarations made at other times, and to other parties, coinciding with his testimony.

This decision contains the germ of the principle which should guide us on the subject under discussion. And deeply as we respect those who decided the two cases cited from *New-York*, by

Scott *v.* Blood.

the counsel for the original plaintiff, we are constrained to withhold our concurrence. They seem to us substantially at variance with former and subsequent decisions in that State, and with decisions in *Massachusetts.*

The case of *Whitney* v. *Ferris,* 10 *Johns.* 66, accords more with our views. There the objection was to evidence of the declarations and acts of *J. Ferris,* implicating *E. Ferris,* until the plaintiff first proved the fact of a partnership between the three persons charged. It was held by the Court, that the declarations and acts of *Jonathan Ferris* were evidence to show that he considered himself a partner with *Bostwick* and *E. Ferris,* but they were not evidence directly to implicate or charge *Elijah* with being a partner. They were admitted in too broad a latitude and the Court could not say what influence they might have had with the jury in charging *Elijah* directly as a partner.

In *Sweating & als.* v. *Turner, in error,* 10 *Johns.* 216, two were sued as partners. They pleaded, that the promises, if made, were made jointly with one *McNeil.* Issue was taken on the point whether the promises were by the defendants alone. They offered to prove by the declarations of the defendants, and of *Mc Neil,* when they were all present together, previous to the time the plaintiff's action accrued, and before the commencement of the suit, that they all declared and acknowledged themselves as partners, and held themselves out to the world as such. The court held, that if the defendants and *McNeil* were partners, they might have shown it by the production of the articles of copartnership, or by witnesses to the agreement. But for the defendants to offer their own declarations in support of their plea was against the rules of evidence. The declarations of a party are good evidence against him, but he never can testify for himself or use his own declarations in his own favor ; *and the declarations of McNeil, he not being a party to the suit, were not evidence. He should have been produced and sworn.*

General reputation merely was considered inadmissible to prove who are officers of a corporation. 7 *Cowen,* 234. And in defence of an action on the case, for a fraudulent representation, the good character of the defendant for fairness and honesty in business

transactions was held to be inadmissible.  16 *Wend.* 646, *Gough* v. *St. John.*

In 5 *Pick.* 514, *Tuttle* v. *Cooper*, declarations and admissions of a person acting as a partner, were held inadmissible to prove a partnership so as to charge others as partners.   Or that a note given by the person so declaring that it was given in the usual course of partnership business.   6 *Pick.* 464, *Robbins & al.* v. *Willard & al.*   Yet precisely such declarations might have laid the only foundation for a reputation, that the party sought to be charged was a partner.   Upon what. just principle then could *reputation as to such a particular fact* be introduced as *prima facie* evidence?   We apprehend, that we shall furnish the best security to society, and best support the established rules of evidence, by overruling the exceptions.   And we do overrule them.